IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDWARD E. BINTZ,                           )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        C.A. No. 22-738-GBW-EGT
                                          )
THE FEDERAL EMERGENCY                     )
MANAGEMENT AGENCY, THE                    )
DEPARTMENT OF HOMELAND                    )
SECURITY and CAMERON HAMILTON,            )
                                          )
                    Defendants.           )

## REPORT AND RECOMMENDATION

Presently before the Court is the motion for summary judgment by Plaintiff Edward E. Bintz ("Plaintiff" or "Mr. Bintz") (D.I. 21) and the cross-motion for summary judgment by Defendants Federal Emergency Management Agency ("FEMA"), Department of Homeland Security ("DHS") and Cameron Hamilton (collectively, "Defendants") (D.I. 23). For the reasons set forth below, the Court recommends Plaintiff's motion for summary judgment be DENIED and Defendants' motion for summary judgment be GRANTED.

## I.    BACKGROUND[1]

FEMA is responsible for conducting flood insurance studies and creating flood insurance rate maps that cover real property based on those studies. *See* 42 U.S.C. §§ 4011 & 4101; *see also* 44 C.F.R. § 64.3. During a flood insurance study,[2] FEMA divides land into subsections and

---

[1]    A more detailed discussion of the technical concepts underlying this action may be found in the prior case between the parties. *See generally Bintz v. Fed. Emergency Mgmt. Agency*, 413 F. Supp. 3d 349 (D. Del. 2019) ("*Bintz I*"). The Court limits its background discussion to only those concepts necessary to understand the dispute herein.

[2]    Although the Code of Federal Regulations predominantly use the term "flood hazard study," the terms "flood hazard study" and "flood insurance study" are synonymous.

evaluates the flood risk for each subsection separately to determine the risk premium rates.  For over a decade now, Plaintiff and FEMA have been embroiled in a dispute related to unfavorable flood risk determinations for Plaintiff's beachfront property in downstate Delaware.

Generally, the process by which FEMA conducts a coastal flood insurance study is multistage and takes into account coastal morphology and historical trends, with the ultimate goal being to determine an area's base flood levels.[3]  (AR 1737).[4]  The process begins with FEMA identifying the particular base topography to be used in the study.  (D.I. 26 at 3; D.I. 24 at 4; *see also* AR 2309).  FEMA then identifies stillwater elevation levels, which are water surface elevations that occur from astronomical tides and storm surge but exclude certain wave contributions.  (D.I. 26 at 3; AR 2028).  At that point, FEMA divides the beach at issue into individual transects, which are cross-sections of the beach that run perpendicular to the shoreline.  (D.I. 26 at 2; D.I. 24 at 4).  Then, FEMA identifies any primary frontal dune present on each transect.  (*Id.*).  A primary frontal dune is a mound of sand that is noticeably steeper than the surrounding sand next to the beach and without another large dune in front of it facing the ocean.[5]  (D.I. 26 at 4).

After attempting to identify a primary frontal dune, FEMA then takes into account potential erosion of the dune before calculating each transect's base flood elevation.  Potential erosion of the primary frontal dune depends on its size.  (D.I. 26 at 4-5).  In estimating potential erosion,

---

[3]    The parties are largely in agreement as to the process that FEMA uses to conduct a flood insurance study.  (*Compare* D.I. 26 at 3-8 (Plaintiff's recitation of the process), *with* D.I. 24 at 4 (Defendants' summary of the process)).

[4]    "AR" citations are to the Administrative Record filed in this case.  (*See* D.I. 11, 16 & 20).

[5]    The Code of Federal Regulations defines a primary frontal dune as "a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms."  44 C.F.R. § 59.1.

FEMA's standard methodology focuses on the size of the cross-sectional area of the primary frontal dune above the 1% annual-chance stillwater elevation. (AR 1868). If that cross-sectional area is less than 540 square feet, the primary frontal dune will be considered an ineffective barrier to flooding and will be destroyed in FEMA's erosion calculations – *i.e.*, "dune removal." (AR 1871).[6] If, however, the cross-sectional area is greater than 540 square feet, the primary frontal dune will be considered an effective barrier and will experience a retreat instead of complete destruction – *i.e.*, "dune retreat." (*Id.*). FEMA then calculates the total potential elevation of surface water expected during a base flood, accounting for the erosion of the primary frontal dune, certain wave contributions and the relevant stillwater elevation, ultimately arriving at the water level where there is a 1% chance of the surface water reaching in any given year. (D.I. 26 at 8). This level is defined as the base flood elevation. Properties built below the base flood elevation and in high-risk zones often carry a greater risk of flooding and higher insurance premiums.

Plaintiff owns a beachfront property in South Bethany, Delaware, which is located along Ocean Drive and within an area identified as Transect 1610. (D.I. 1 ¶ 14). In 2015, FEMA issued a Preliminary Flood Insurance Rate Map that had the effect of increasing the base flood elevation of Transect 1610 from 12 feet to 13 feet.[7] (*See* D.I. 1 ¶ 36). Plaintiff challenged the 2015 Preliminary Map in a related case in this District and, on September 4, 2019, Judge Conner[8] issued a decision that "set aside the base flood elevations for Transect 1610 as established in the 2015

---

[6]    Owing to the 540-square-foot standard, this rule is often referred to as "the 540 Rule."

[7]    Originally, a 2013 Preliminary Flood Insurance Rate Map assigned a base flood elevation of 10 feet to Transect 1610. (D.I. 1 ¶ 35). FEMA amended the base flood elevation to 13 feet but ultimately revoked and replaced that rate map with the 2015 Preliminary Flood Insurance Rate Map. (*Id.*). Prior to the 2013 map, the base flood elevation assigned to Transect 1610 was 12 feet pursuant to a 2005 Flood Insurance Rate Map. (D.I. 24 at 5-6).

[8]    Judge Christopher C. Conner of the Middle District of Pennsylvania, then Chief Judge, was sitting by designation in the earlier related case.

Preliminary Map and remand[ed] the matter to FEMA for further investigation." *Bintz*, 413 F. Supp. 3d at 368. Specifically, Judge Conner found that FEMA acted arbitrarily and capriciously when it applied non-standard erosion methodology without sufficient explanation to arrive at a 13-foot base flood elevation for South Bethany. *Id.* at 366.

Following remand in *Bintz I*, on January 3, 2020, FEMA issued a "Notice to Flood Insurance Rate Map (FIRM) User," which had the effect of vacating the 2015 Preliminary Flood Insurance Rate Map and reinstating the most recent previously effective map. (AR 0016). Accordingly, the 2005 Flood Insurance Rate Map that set the base flood elevation for South Bethany at 12 feet became effective again. (*See, e.g.*, AR 0367-68 & 0404). Although FEMA had originally intended to defer any repeat flood insurance study, FEMA decided to resume efforts after learning in April 2020 that property owners in South Bethany experienced large increases to their flood insurance premiums from reinstatement of the 2005 Flood Rate Insurance Rate Map. (AR 0004, 0364-68, 0382, 1580-81, 2500 & 3793-94).[9]

FEMA engaged a private firm, Compass, as its mapping partner to conduct the repeat flood insurance study for South Bethany. (AR 2270-2346; *see also* AR 2299-2346 (Compass's Project Narrative after study complete)). FEMA again used a non-standard erosion methodology. (AR 2334-35). Based on the results of the study, FEMA originally issued one Letter of Map Revision for the riverine side of South Bethany on July 30, 2020 and one for the coastal side of South Bethany on February 4, 2021. (AR 0421 & 0475).[10] In response to concerns about the lack of notice and comment, FEMA rescinded both Letters of Map Revision on February 26, 2021 and

---

[9]    Plaintiff (and other property owners) suggested that FEMA reinstate the rescinded map everywhere except for Plaintiff's property. (AR 1580-81 & 3793). FEMA asserts that there was "no feasible way to accomplish this." (D.I. 24 at 7 n.10; *see also* AR 3793).

[10]    A letter of map revision is a process that FEMA uses to modify a flood insurance rate map. (*See* D.I. 26 at 3; *see also* D.I. 24 at 7 n.11).

provided a new comment period. (AR 0437-41, 0445-46, 0483-85, 0518-20, 0542-43 & 0567-68). On September 27, 2021, FEMA ultimately issued one Letter of Map Revision for all of South Bethany with an effective date of February 14, 2022. (AR 0708-17; *see also* AR 0718-19 (proposed base flood elevations published in Federal Register and local newspaper)).

On January 10, 2022, Plaintiff appealed the base flood elevations set forth in the 2021 Letter of Map Revision pursuant to 42 U.S.C. § 4104(b) and 44 C.F.R. § 67.6(b). (*See generally* AR 0725-40). In his administrative appeal, Plaintiff challenged several of FEMA's modeling assumptions underlying the 2021 Letter of Map Revision as scientifically and technically incorrect, and he proposed different flood hazard determinations for the area based on his alternative analyses. (AR 0725-40). Plaintiff also submitted material from Sustainable Coastal Solutions, Inc., an engineering firm he retained to review FEMA's coastal analysis. (AR 0741-52).[11] After reviewing Plaintiff's letter and accompanying submissions, FEMA declined to revise the 2021 Letter of Map Revision and explained the reasoning underlying its modeling and base flood elevation determinations. (AR 0873-86 (Appeal Resolution Letter dated April 4, 2022)). Because the effective date was delayed by Plaintiff's appeal, FEMA reissued the 2021 Letter of Map Revision on April 5, 2022 and it became effective the same day. (*See* AR 1516-25). The 2021 Letter of Map Revision designated Transect 1610 as having a base flood elevation of 12 feet and being in a VE Zone, indicating a heightened risk for flooding. (AR 1525; AR 1916).

---

[11]    When a party appeals FEMA's decision based on scientific or technical correctness other than calculation or measurement errors, the party must provide "technical support indicating why the appellant's methods should be accepted as more correct." 44 C.F.R. § 67.6(b)(2)-(3); *see also id.* § 67.6(a) ("Because scientific and technical correctness is often a matter of degree rather than absolute (except where mathematical or measurement error or changed physical conditions can be demonstrated), appellants are required to demonstrate that alternative methods or applications result in more correct estimates of base flood elevations, thus demonstrating that FEMA's estimates are incorrect.").

Plaintiff filed this action on June 6, 2022, again seeking a determination under 42 U.S.C. § 4104(g) that FEMA acted arbitrarily and capriciously in issuing the most recent iteration of South Bethany's base flood elevations. (D.I. 1 ¶¶ 8-10). Plaintiff's Complaint also included claims that Defendants' actions following remand in *Bintz I* violated the federal court's mandate rule and the Administrative Procedure Act ("the APA"). (*Id.* ¶¶ 63-72). In addition to reversal of FEMA's decision and remand back to the agency for further proceedings, Plaintiff seeks, *inter alia*, to have this Court limit FEMA's conduct on remand and order FEMA to refund South Bethany property owners certain sums of money. (D.I. 1 at 22-23 (Prayer for Relief)).

The parties have filed cross-motions for summary judgment, with each side arguing that they are entitled to judgment as a matter of law. (D.I. 21 (Plaintiff's motion), D.I. 23 (Defendants' cross-motion)). Briefing was completed on September 20, 2023. (*See* D.I. 22, 24, 25, 26 (briefing on Plaintiff's motion); D.I. 24, 25, 27, 28 (briefing on Defendants' motion)). On October 4, 2023, Plaintiff filed a motion to strike Defendants' reply brief in support of their cross-motion for summary judgment (D.I. 30) and, on the same day, Plaintiff also requested in the alternative leave to file a sur-reply in support of his motion for summary judgment (D.I. 29). Defendants opposed. (D.I. 32; *see also* D.I. 33). By separate order on this date, the Court denied Plaintiff's motion to strike and granted his request for leave to file a sur-reply. (D.I. 36). Plaintiff's sur-reply has been docketed (D.I. 37), and the Court has considered it in ruling on the present motions.

## II.    **LEGAL STANDARDS**

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing a challenged agency action, "summary judgment is the 'mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review.'" *La. Forestry Ass'n, Inc. v. Solis*, 889 F. Supp. 2d 711, 720 (E.D. Pa. 2012) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The customary summary judgment standard does not apply." *Bintz v. Fed. Emergency Mgmt. Agency*, 413 F. Supp. 3d at 360. Rather, under the APA standard, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

## III.    **DISCUSSION**

Both sides seek summary judgment on the three claims asserted in the Complaint: Plaintiff's Appeal Pursuant to 42 U.S.C. § 4104(g) (Count I), Plaintiff's Claim of Violation of the Federal Courts' Mandate Rule (Count II) and Plaintiff's Claim of Violation of the Administrative Procedure Act, 5 U.S.C. § 555(b) (Count III). The Court will address the parties' cross-motions for summary judgment as to each count in turn.

### A.    **Plaintiff's Appeal Pursuant to 42 U.S.C. § 4104(g) (Count I)**

Plaintiff's appeal under § 4104(g) is based on the argument that FEMA's determination of a base flood elevation of 12 feet for Transect 1610 was arbitrary and capricious for several reasons: (1) FEMA mischaracterized Hurricane Sandy and Winter Storm Jonas as 10-year or less storms, (2) FEMA improperly treated a 1999 revetment as existing for more houses than it actually did, (3) FEMA incorrectly found a primary frontal dune with a dune line running along Ocean Drive, (4) FEMA made incorrect and misleading statements about its dune erosion methodology, (5) FEMA incorrectly applied its wave runup model, Runup 2.0, and (6) FEMA improperly concluded that its analysis was more correct than Plaintiff's. (*See* D.I. 26 at 15-34).

1.    Hurricane Sandy and Winter Storm Jonas as 10-Year or Less Events

Underlying FEMA's base flood elevations for South Bethany was the determination that certain historical storms (Hurricane Sandy and Winter Storm Jonas) were 10-year or less storms – *i.e.*, storms that have at least a 10% chance of happening any given year.  In reaching that conclusion, FEMA (through Compass) determined stillwater elevations for various percent-annual-chance exceedance levels[12] for the Delaware Bay and the Atlantic Ocean by using data from the 2013 storm surge study conducted for FEMA by the U.S. Army Corps of Engineers ("the Region III Study").  (AR 2315; *see also* AR 0887-1147).  Using that study and storm water levels measured in Lewes, Delaware, FEMA determined that Winter Storm Jonas would result in a flood level corresponding to the 10-percent-annual chance flood level at South Bethany (*i.e.*, 6.6 feet (NAVD88)).  (AR 2333; *see also* AR 1758 & 2305 (all elevations relative to North American Vertical Datum of 1988 (NAVD88) standard reference point)).  And Hurricane Sandy resulted in peak levels 0.5 feet lower than a 10-percent-annual-chance storm event.  (AR 2333).  As such, FEMA concluded both storms were 10-year or less events, which ultimately supported use of a modified erosion profile for South Bethany.  (AR 2333).  Plaintiff alleges that FEMA acted arbitrarily or capriciously in reaching these determinations.  In Plaintiff's view, Hurricane Sandy and Winter Storm Jonas were actually 30-year and 70-year storms, respectively.[13]  (D.I. 26 at 17).

In support of his argument, Plaintiff notes that the conclusions about Hurricane Sandy and Winter Storm Jonas were based on water levels occurring at the Lewes, Delaware tide station. (D.I. 26 at 15-16).  Plaintiff claims that comparing water levels at the Lewes tide station with South

---

[12]    The specific levels were the 10%, 2%, 1% and 0.2% annual-chance exceedance levels. (AR 2315).

[13]    A 30-year storm is one that is expected to happen once every 30 years, and a 70-year storm is one that is expected to happen once every 70 years.

Bethany was improper because the Lewes tide station consists of sheltered waters and South Bethany is an open coast. (*Id.*). According to Plaintiff, the sheltered waters at Lewes do not include "a material amount of wave setup," whereas wave setup can contribute significantly to water levels in open water in locations such as South Bethany per FEMA guidance. (*Id.* at 16; *see also* AR 1760 (FEMA 2007 Coastal Guidelines explaining that "little wave setup is reflected in tide gage data because gages are often located in protected areas not subject to much setup"); AR 3812 (FEMA 2015 Coastal Wave Setup Guidance explaining that "[w]ave setup can be a significant contributor to the total water level and should be included in the determination of coastal Base Flood Elevations (BFEs)")). Plaintiff believes that the more correct analysis should be a comparison between the storm water levels at the Lewes tide station and the NOAA-calculated return periods at that station during different events. (D.I. 26 at 17; AR 0726-28 & 0754). According to Plaintiff, that exercise results in Hurricane Sandy and Winter Storm Jonas being 30-year and 70-year storms, respectively. (D.I. 26 at 17). Plaintiff cites other engineers and 2013 and 2016 U.S. Army Corps of Engineers publications in support of his conclusion. (AR 0742; *see also* AR 0755-57 (Sandy is 30-year event) & 0759 (Jonas is 70-year event)). Plaintiff argues that his model results in less sand loss than FEMA's, thereby justifying application of a standard erosion methodology to South Bethany – rather than the modified one applied by FEMA.

In response, Defendants assert that Plaintiff's alternative analysis uses less sophisticated methods than FEMA's. (D.I. 24 at 12). The data in its FEMA's Region III Study "uses more advanced frequency analysis (a Joint Probability Method, or 'JPM') that accounts for wider regional climatology and a detailed 2D wave and surge model of 186 production storms that can account for the spatial variation of storm-induced water levels in a study area." (*Id.*; *see also* AR 0875 & 1149). The data in Plaintiff's analysis, however, is more limited in that it only focuses on

storms that occurred at the specific Lewes tide station.  (D.I. 24 at 13; *see also* AR 0875 (FEMA notifying Plaintiff of this discrepancy in denying his administrative appeal)).  In Defendants' view, comparing storms levels from the Lewes station to less refined tide statistical analysis "leverages only observed storms at the location of the [gage] and does not account for the more advanced representation of storm statistics done with the [Region III Study]."  (D.I. 24 at 13 (citing AR 0875-76)).  Defendants argue that FEMA's comparison of the South Bethany frequency data from the broader Region III study with the Lewes tide data[14] is a better comparison of individual storms and is based on a method that has been used for flood maps for "nearly every community in the region."  (D.I. 24 at 12-13).  Defendants maintain that Plaintiff has failed to show his analysis is more correct or that FEMA's rejection thereof and adoption of its own analysis was arbitrary, capricious or otherwise not in accordance with law.  The Court agrees.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 824 F.3d 33, 40 (3d Cir. 2016).  In conducting this review, the Court must ensure that the agency examined "the relevant data" and articulated "a satisfactory explanation" for its action.  *Prometheus*, 824 F.3d at 40.  There must also be "a rational connection" between the facts and the agency's decision.  *Id.*  The Court finds that FEMA did all of the above.  FEMA's characterization of Hurricane Sandy and Winter Storm Jonas as 10-year or less storms was based on an analysis drawing from a detailed regional study "with 2D hydrodynamic and wave modeling

---

[14]    In response to Plaintiff's criticism (D.I. 26 at 15-16), Defendants recognize that storm surge values can vary along a shoreline, but they maintain that FEMA properly used storm water levels at the Lewes station because there is no tide station in South Bethany, and Lewes is the "closest, most comparable" tide gage to South Bethany (D.I. 24 at 12 n.14).

of 186 production storms" and one that created a "high-resolution representation of storm time elevation-frequency" along the relevant coast here. (AR 0875). FEMA explained how that data compared with storm levels at the Lewes tide station to result in both storms being considered 10-year or less storms. And FEMA adequately explained how that analysis was more robust than any alternative data or analysis that Plaintiff provided. Although Plaintiff continues to rely on 2013 and 2016 U.S. Army Corps of Engineers documents to support his claim that Hurricane Sandy was a 30-year event and Winter Storm Jonas was a 70-year event, FEMA adequately explained why it declined to give weight to those findings because the documents provided no basis for the estimates or underlying data. There is no requirement that FEMA reach the same conclusions as the U.S. Army Corps of Engineers or that FEMA is somehow bound by their statements. Plaintiff has failed to show that FEMA acted arbitrarily or capriciously in determining that Hurricane Sandy and Winter Storm Jonas were 10-year or less events.

### 2.    FEMA's Treatment of the 1999 Revetment

In creating its modified erosion methodology to arrive at the base flood elevations for South Bethany, FEMA treated a 1999 buried rock revetment as existing along the east side of Ocean Drive. (AR 2335; *see also* AR 2016 (revetment is facing of stone, concrete or other material to protect against erosion from waves or currents)). Plaintiff also challenges this, claiming that the 1999 revetment was installed at only six Ocean Drive houses. (D.I 26 at 19; *see also* AR 2335 & 0728-30). Plaintiff explains that he raised this issue in his administrative appeal and that FEMA responded by treating other revetments installed by property owners in the 1980s as equivalent to the 1999 revetment. (D.I. 26 at 19-20; *see also* AR 0876). Plaintiff argues that the beach profile changed since the 1980s necessitating larger stones for revetments because of the beach conditions. (D.I. 26 at 19-20; *see also* AR 0729 (Plaintiff's appeal letter) & 0876 (FEMA's response)). And Plaintiff also claims that the 1980s revetment has been damaged by storms and that FEMA does

not know which houses have the revetment.  (D.I. 26 at 20; *see also* AR 2319, 2321 & 2334).  In Plaintiff's view, because FEMA's modified erosion methodology is based on the presence of a revetment that FEMA knows little about, application thereof was arbitrary and capricious.  The Court disagrees.

As Defendants point out, FEMA relied on revetment information provided by the Delaware Department of Natural Resources and Environmental Control ("DNREC"), and DNREC explained that "with very few exceptions, this revetment design is what was built along the entire east side of Ocean Drive."  (D.I. 24 at 14 (quoting AR 0876)).  In response to the administrative appeal, FEMA acknowledged that the revetment design was apparently changed to one layer of stone (rather than two) but found that Plaintiff failed to show that that change "would have an appreciable effect on revetment performance or flood mapping results."  (D.I. 24 at 14; *see also* AR 0876).  FEMA also noted that Plaintiff failed to provide technical justification for a more representative structure geometry or any corresponding mapping changes.  (AR 0876).

In the Court's view, FEMA did not act arbitrarily or capriciously in using its revetment information to arrive at a modified erosion methodology for South Bethany.  Although Plaintiff has alluded to Town Council minutes with different information regarding the revetment (AR 0729), it was not unreasonable for FEMA to rely on DNREC's information.[15]  And the administrative record shows that FEMA considered Plaintiff's information and determined that, even if variations as to dates and parcel location exist, the oceanfront properties were revetted and that any differences in properties were not shown to "have an appreciable effect on revetment

---

[15]     Indeed, FEMA guidance provides that if "as-built documents" for a coastal protection structure are absent, then FEMA proceeds with "best available data, standard design and engineering assumptions, and conservative estimates of material properties."  (AR 2212). Defendants argue that FEMA acted consistent with this guidance when it relied on information provided by DNREC.  (D.I. 24 at 14).

performance of flood mapping results." (AR 0876). Moreover, FEMA noted that Plaintiff had failed to provide technical support for any other representative geometry. FEMA thus examined the relevant data and provided a satisfactory explanation for its finding that a revetment existed along the east side of Ocean Drive. Its revetment treatment was not arbitrary or capricious.

### 3.    FEMA's Primary Frontal Dune Running Along Ocean Drive

In undertaking the remapping efforts for the 2021 Letter of Map Revision, FEMA applied a primary frontal dune to Ocean Drive based on one from the 2015 Sussex County Flood Study. (AR 2340; *see also id.* (Project Narrative explaining that it is "standard practice" to follow the historical primary frontal dune line)). In support of its primary frontal dune, FEMA relied on the following historical data: (1) South Bethany Sanitary and Sewer Maps from 1973, (2) Topographic Mapping of Delaware Beaches from 1979 from the state of Delaware and (3) a description of South Bethany in the 1960s and 1970s contained in a document from the Town South Bethany. (AR 0877; *see also* AR 1255-1261 (1973 sewer maps and 1979 topographic mapping) & 1272 (South Bethany 40th anniversary document explaining that Ocean Drive did not exist in the late 1960s and early 1970s)). This historical data demonstrated that the original beach and dunes extended to and even further than Ocean Drive and that, over the years, the dunes have been pushed seaward. (AR 0877). Later topographic data from 2017 also showed that the dune peaks for South Bethany are more seaward and the dunes narrower than those present north or south of South Bethany. (*Id.*). As such, the historical evidence demonstrated primary frontal dune features narrower and more seaward than neighboring areas – regional dune features consistent with the primary frontal dune in the 2015 Sussex County Flood Study. According to FEMA, it is important to maintain regional dune features and avoid modifying historical primary frontal dunes (*e.g.*, based on man-made features). (AR 0877 (citing FEMA Standard 619); *see also* D.I. 24 at 16).

Plaintiff argues that the primary frontal dune used in the 2021 Letter of Map Revision violated the primary frontal dune regulation because, in his view, there is no feature near Ocean Drive that can be viewed as a "relatively steep landward slope abutting a markedly flatter and lower region." (D.I. 27 at 7; *see also* AR 730-31 & 745-46). Pointing to FEMA guidelines and statutory authority providing that the "most accurate topography and elevation data" be used,[16] Plaintiff argues that the dune built by the U.S. Army Corps of Engineers in the 2008 nourishment should be the primary frontal dune. (D.I. 26 at 25-26; *see also* AR 0730-33 (Plaintiff's administrative appeal arguing the same)). But FEMA considered Plaintiff's position in his appeal and concluded that he failed to provide adequate support to change the primary frontal dune as proposed. (AR 0880). This Court has been provided with nothing to support a finding that FEMA's primary frontal dune is incorrect, that Plaintiff's primary frontal dune is more correct or that FEMA's decision to use its own analysis over Plaintiff's was arbitrary or capricious. Indeed, having reviewed FEMA's justification for use of the 2015 primary frontal dune based on historical data of the beach profile of South Bethany, as well as the articulated importance of maintaining consistency for regional dune features, the Court finds that FEMA's decision is well supported. Despite Plaintiff's claims to the contrary (D.I. 37 at 1-2), FEMA has not engaged in any post-hoc rationalization based on data existing outside the record.

Ultimately, Plaintiff disagrees with FEMA's primary frontal dune analysis,[17] but the standard of review under the APA is a narrow one. The Court must ensure that the agency

---

[16]     FEMA guidelines provide that the topographic data "must be recent and reflect current conditions or, at a minimum, conditions at a clearly defined time." (AR 1716). And 42 U.S.C. § 4104b(b)(1)(C) requires use of the most accurate topography and elevation data.

[17]     Plaintiff also argues that Standard 619 is invalid under the APA for failure to comply with the necessary notice and comment requirements. (D.I. 27 at 7-8). Because Plaintiff never raised this issue in his administrative appeal and he only raised it for the first time in his reply brief, the Court will not address it.

examined the relevant data, provided a satisfactory explanation for its action and, further, that there is a rational connection between the facts and the decision. *See Prometheus*, 824 F.3d at 40. "[A] court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. FEMA followed its standard practice of looking to historical evidence of regional dune features when it identified the primary frontal dune for the 2021 Letter of Map Revision. This decision was not arbitrary or capricious.

### 4.    FEMA's Application of a Modified Erosion Methodology

As part of a coastal flood study, FEMA calculates storm-induced erosion for the study area.[18] (*See supra* § I; *see also* D.I. 24 at 17). Although FEMA typically uses standard erosion methodology "based on general assumptions regarding storm-induced erosion," each study area is unique, and FEMA guidance permits modified erosion models to achieve "results more consistent with historical records." (D.I. 24 at 17; *see also* AR 2329 ("Common practice for flood studies along the Atlantic and Gulf Coast of the United States is to evaluate open coast dune erosion using FEMA's standard erosion approach, then validate the erosion assessment based on historical evidence (FEMA, 2007)."); AR 2329-31 (discussing standard erosion methodology)). Here, FEMA evaluated its standard erosion model as applied to South Bethany but found that that model yielded results that were inconsistent with historical storm erosion. (*See, e.g.*, AR 2333 ("Review of the dune removal profiles at South Bethany showed significant inconsistencies with the erosion trends from post-nourishment storms . . . . In addition to the differences in removal geometry versus the historical storm evidence, the dune erosion areas from a removal geometry appeared to underestimate the quantity of historical erosion observed at South Bethany."); *see also* AR 2317-

---

[18]    "The primary factor controlling the basic type of dune erosion is the pre-storm cross section lying above the 1-percent-annual-chance [stillwater elevation] (frontal dune reservoir). The Mapping Partner shall determine this area to assess the stability of the dune as a barrier." (AR 1868).

2322 (historical erosion evidence for South Bethany)). In particular, FEMA found that the standard erosion methodology did not properly account for severe erosion that occurred in the area from historical storms – *i.e.*, the Ash Wednesday Storm of 1962 and various winter storms in the 1990s. (*See* AR 2317-18 (describing and depicting damage from 1962 storm) & 2319 (describing and depicting damage from 1990s storms)). Indeed, despite a 2008 beach nourishment project undertaken by the U.S. Army Corps of Engineers, even recent storms (including Hurricane Sandy and Winter Storm Jonas) continued to cause significant shoreline retreat and dune scarping in South Bethany. (AR 2319-20; *see also* AR 2322-29). According to FEMA, the standard erosion model failed to yield results consistent with this historically observed erosion. (*See* AR 2333 (standard erosion methodology resulted in dune removal for Ocean Drive transects but failed to account for shoreline retreat and berm erosion observed from storms); *see also id.* ("[T]he amount of sand loss above the peak measured water elevations [for Ocean Drive] were significantly higher than what would have been expected [under the 540 Rule].")).

FEMA therefore modified the standard erosion methodology for the South Bethany coastal study pursuant to FEMA guidance "to ensure that erosion treatment was more consistent with demonstrated local and historic erosion conditions." (AR 2329-35; *see also* AR 2123 ("[A]n erosion treatment providing results more consistent with historical records may be selected as appropriate.")). Relying on prior studies where dune removal was not representative, FEMA explained how the standard erosion methodology allows for modification from dune removal to a dune retreat to create "a more realistic beach profile response" by "increasing the landward extent of erodible material in the dune reservoir." (AR 2334). In the case of South Bethany, this modified erosion profile "allowed the dune retreat to extend inland to account for inland volumes of sand" that contribute to protection of inland areas, and it also "preserved the slope conditions" of the

standard dune retreat geometries that were historically observed.  (*Id.*).  The modified erosion methodology also halted the inland retreat of dunes at the point of revetment structures along Ocean Drive as FEMA found "insufficient justification" to support their assumed failure.  (*Id.*; *see also* AR 2321 (describing location and structural features of the revetments)).  After FEMA designed its method, it sought input from DNREC officials, who agreed with the analysis and erosion profiles in the modified methodology.  (AR 2335).  FEMA also evaluated two other alternative erosion models to account for historical evidence for South Bethany but ultimately concluded that its modified erosion methodology was the "most appropriate."  (AR 2336-37).

Plaintiff asserts that FEMA makes several incorrect or misleading statements in trying to justify its modified erosion methodology.  (*See* D.I. 26 at 26-28; *see also* D.I. 27 at 10-12).  Plaintiff argues that "no damage or flooding" has occurred to the coast of South Bethany since the 2008 beach nourishment project to support use of the modified methodology.  (D.I. 27 at 10).  In Plaintiff's view, the only way that FEMA could arrive at such a conclusion is if it considers dune erosion to be "damage" and "the pooling of water landward of the dune" to be "flooding."  (*Id.*).  Defendants respond that dune erosion is damage and water pooling is flooding and, more importantly, that both damage and flooding have occurred in South Bethany since the 2008 nourishment project.  (D.I. 28 at 4).  And that historically observed damage and flooding indicates that the standard erosion methodology underestimates the coastal hazard in South Bethany.  In Defendants' view, none of the allegedly "incorrect or misleading" statements identified by Plaintiff demonstrate that FEMA's use of the modified erosion methodology in this case was arbitrary or capricious.  (D.I. 24 at 16-17).[19]  The Court agrees.

---

[19]    The parties also dispute whether dune construction in beach nourishment projects should be considered a "temporary shoreline disturbance."  (*Compare* D.I. 28 at 4-5 (Defendants arguing that "extensive history of damage and flooding" should not be ignored because of

As set forth above, FEMA concluded that the results of the standard erosion methodology did not align with the historical information of damage and flooding that had occurred in South Bethany.  FEMA thus decided to apply a modified erosion methodology that was more consistent with historically observed damage to the South Bethany coast.  And FEMA has provided sufficient explanation and rationale for doing so.  Moreover, FEMA considered the 2008 nourishment and other objections raised by Plaintiff, but ultimately determined that recent "examples of storms that caused erosion, damage, flooding, and sand loss to South Bethany (even after nourishment efforts)" demonstrated that such storms happen frequently in the area and that the standard erosion method underestimates the coastal hazard.  (AR 0880-84)  Plaintiff has not shown that FEMA failed to consider relevant data or that FEMA failed to adequately explain the reasons for modifying the standard erosion methodology as applied to South Bethany's coast.  FEMA's use of a modified erosion methodology was not arbitrary or capricious.

5.    FEMA's Wave Runup Calculations

As part of a coastal flood study, FEMA calculates wave runup on shore barriers in the study area.  "Wave runup is the uprush of water from wave action on a shore barrier intercepting stillwater level."  (AR 1832; *see also* AR 2338 ("Wave runup is the maximum vertical extent of wave uprush on a beach, dune, or structure above the [stillwater elevation].")).  In the remapping efforts in South Bethany, FEMA applied its Runup 2.0 wave runup modeling.  (AR 2338-39).  According to FEMA guidance from 2007, Runup 2.0 requires inputs for the stillwater flood level (without wave setup)[20] and shore profile and roughness, as well as the incident deepwater wave

---

constructed dunes, "which FEMA defines as a temporary shoreline disturbance"), *with* D.I. 37 at 3 (Plaintiff arguing that FEMA's Project Narrative is at odds with this assertion)).  This issue was not part of the administrative appeal and the Court declines to reach it now.

[20]    Wave setup is "superelevation of the water surface over normal surge elevation due to onshore mass transport of the water by wave action alone."  (AR 2023).

conditions.  (AR 1834).  That being said, the Project Narrative for the South Bethany remapping efforts states that "Runup 2.0 was run on [stillwater elevation level] *(with wave setup)*, as recommended by the FEMA guidance."  (AR 2339 (emphasis added)).  Plaintiff argues that FEMA thus incorrectly applied Runup 2.0 to South Bethany because it failed to remove wave setup from the stillwater elevations in direct contravention of the 2007 guidance.  (D.I. 26 at 29; *see also* AR 1836 & 1832 n.6 (FEMA guidelines instructing mapping partners to "remove [wave setup from stillwater elevations] component before using [Runup 2.0] so that the calculated runup elevations do not indicate doubled wave setup"); AR 2339).  In Plaintiff's view, this failure to remove stillwater wave setup is an error that resulted in "overstated" base flood elevations for South Bethany.  (D.I. 26 at 29).[21]

Defendants acknowledge the FEMA guidance and that FEMA did not remove wave setup from its model, but they deny that any failure to remove wave setup resulted in incorrect calculations.  (D.I. 24 at 18).  According to Defendants, FEMA used a Runup 2.0 modeling procedure that contains wave setup that is "integrated into the wave and surge modeling" and is consistent with all other flood insurance studies across the country and Letters of Map Revisions along the Atlantic coast – including in Sussex County, Delaware.  (*Id.* at 18-19; *see also* AR 0884 & 2338-39).  Recognizing the potential to overestimate wave setup, FEMA conducted a study in North Carolina "to evaluate the extent that the inclusion of wave setup in the combined elevations could bias wave runup values," ultimately concluding that "any incidental wave runup did not materially impact modeling results."  (D.I. 24 at 19; *see also* AR 0884, 1295-1303 (memorandum regarding North Carolina study), 1304, 1348 & 1356).  FEMA has consistently applied a Runup 2.0 model that includes wave setup ever since.  (D.I. 24 at 19).  Defendants also explain

---

[21]    The error being purportedly double-counted wave setup for a given area.

that coastal modeling best practices have changed since the 2007 FEMA guidance that instructs mapping partners to remove wave setup from stillwater elevations.  (D.I. 24 at 19; *see also* AR 1686 (2007 FEMA guidance acknowledging that the guidelines "require technical judgment and experience in their application and do not generally offer a prescriptive technique that can be applied uniformly in all study areas")).  And practice has apparently shown that the current Runup 2.0 modeling has eliminated the need "to conduct a separate wave setup analysis as it is inherent within the coupled wave and surge modeling."  (D.I. 24 at 19; *see also id.* at 20 ("This coupling of models was not commonly used at the time of the 2007 guidance, but it is in the process of being incorporated into FEMA guidance.")).  FEMA explained all of these points to Plaintiff in his administrative appeal.  (AR 0884-85).

Plaintiff continues to challenge application of the modified Runup 2.0 model and FEMA's interpretation of the North Carolina study.  (*See* D.I. 26 at 29-33).[22]  According to Plaintiff, the study is unreliable because it did not remove wave setup from the stillwater elevation to which the calculated wave runup under Runup 2.0 is added.  (*Id.* at 30; *see also id.* (asserting that the North Carolina study should have removed wave setup from the stillwater elevations for the Runup 2.0 calculations and from the stillwatever elevations to which calculated runup is added)).  Plaintiff contends that, if wave setup is also removed from the stillwater elevations where runup is added, the North Carolina study base flood elevations increase "by at least one foot."  (*Id.*).  As such, the study purportedly shows that not removing wave setup does have a material impact on base flood elevation determination.  Plaintiff also claims that the North Carolina study concluded with a

---

[22]    Plaintiff also argues that FEMA erred in interpreting its own guidance when evaluating whether to remove wave setup from its wave runup calculations. (D.I. 26 at 31-33).  The Court has reviewed Plaintiff's objections and FEMA's explanations and concludes that, under the proper deference due, FEMA's interpretation is reasonable and entitled to considerable weight. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

recommendation that mapping partners review transects and use judgment in deciding whether to include wave setup in Runup 2.0 runup calculations. (D.I. 27 at 13; *see also* AR 1303). In Plaintiff's view, FEMA failed to comply with that directive when it undertook remapping efforts in South Bethany. (D.I. 27 at 13; *see also* D.I. 24 at 21 (Defendants responding that the South Bethany gentle-slope beaches are well-suited to this Runup 2.0 model)).

As set forth above, the continued dispute between the parties over FEMA's Runup 2.0 calculations for South Bethany is focused on whether FEMA improperly contravened its own guidelines and whether the North Carolina study is a sufficient justification for deviating from guidelines to include wave setup in wave runup calculations. The Court agrees with FEMA as to both. The purpose of the North Carolina study was to evaluate the impact of including wave setup in wave runup calculations. (*See* AR 1295-1303; *see also* AR 1496 (the study "did not intend to evaluate the changes" to base flood elevation)). Extrapolating its results to make conclusions about base flood elevations, as Plaintiffs attempts to do, is not supported by anything in the administrative record. Moreover, the study concluded that including wave setup in Runup 2.0 wave runup calculations did not have a meaningful impact on those calculations and, in flood insurance studies since then, FEMA has calculated Runup 2.0 wave runup with wave setup included in stillwater elevations (despite the 2007 guidance). FEMA considered Plaintiff's objections and suggestions but ultimately determined that his model did not align with current FEMA study methodologies and was unjustified and incorrect. (AR 0885). Nothing that Plaintiff has raised in his appeal before this Court casts sufficient doubt on FEMA's decisions. FEMA's wave runup calculation (and rejection of Plaintiff's) was not arbitrary or capricious because it was based on consideration of relevant data and supported by satisfactory explanation.

6.      FEMA's Conclusion that Plaintiff's Was Not a More Correct Analysis

In his final argument related to his appeal under § 4104(g), Plaintiff incorporates all of the previous five sections and asserts that his analysis results in a more scientifically and technically correct flood map than FEMA's.  In particular, Plaintiff claims that his analysis is superior because (1) it applies the "same standard erosion" methodology to Transect 1610 as FEMA applied to "Bethany Beach and everywhere else in Sussex County," (2) it correctly characterizes Hurricane Sandy and Winter Storm Jonas, (3) it identifies a primary frontal dune that complies with the relevant regulation (44 C.F.R. § 59.1) and (4) it excludes wave setup from the water level in applying wave Runup 2.0.  (D.I. 26 at 33).  Plaintiff emphasizes the fact that his analysis was supported by an independent coastal engineering firm (Sustainable Coastal Solutions) and was certified by an unaffiliated coastal engineer.  (D.I. 26 at 33-34).  In Defendant's view, Plaintiff's methodology ignores historical damage to South Bethany and underestimates erosion and, as such, does not result in a more accurate base flood elevation.[23]  (*See* D.I. 24 at 21-22).  Defendants argue that Plaintiff failed to demonstrate that his alternative analysis results in "more correct estimates of base flood elevations."  (D.I. 24 at 21 (quoting 44 C.F.R. § 67.6(a)); *see also* AR 0875-86 (FEMA rejecting Plaintiff's proposed alternative analyses on point-by-point basis)).

Whether Plaintiff provided a more scientifically and technically correct flood map and analysis is not for this Court to decide under the APA.  Rather, the Court must decide whether FEMA acted arbitrarily, capriciously or otherwise not in accordance with law when it found that Plaintiff's analysis was not more scientifically and technically correct.  For all the reasons already set forth above, FEMA's rejection of Plaintiff's alternative analysis was not arbitrary or capricious.

---

[23]     Plaintiff faults FEMA for rejecting his analysis without asking for additional data (D.I. 27 at 15), but he has provided no authority to suggest that FEMA is obligated to do so.

The Court has considered all grounds raised by Plaintiff in connection with his appeal of the 2021 Letter of Map Revision for South Bethany that set a base flood elevation of 12 feet for Transect 1610. None of those grounds suffices to show that FEMA acted arbitrarily, capriciously or otherwise not in accordance with law in reaching the base flood elevations for South Bethany. The Court therefore recommends that Plaintiff's motion for summary judgment be denied and Defendants' motion for summary judgment be granted as to Count I.

**B.       Plaintiff's Claim that FEMA Violated the Mandate Rule (Count II)**

In Count II, Plaintiff asserts that FEMA violated the *Bintz I* mandate by (1) repealing the 2015 Preliminary Rate Map for all of South Bethany rather than just the portion covering Plaintiff's property and (2) by not adequately explaining the impact of Hurricane Sandy and Winter Storm Jonas to South Bethany and neighboring subdivisions. (*See* D.I. 1 ¶¶ 63-68; D.I. 26 at 12-14). In Plaintiff's view, Judge Conner's opinion and the ultimate mandate in *Bintz I* only addressed the 2015 Preliminary Map as it applied to Plaintiff's property within Transect 1610. (D.I. 26 at 12-13). Plaintiff argues that any action by FEMA after *Bintz I* should have therefore been limited to his property instead of all South Bethany. At the same time, Plaintiff maintains that the mandate also required FEMA to explain the impact of Sandy and Jonas as applied to all of South Bethany and neighboring communities. (D.I. 26 at 13-14). The Court disagrees as to both.

The problem with Plaintiff's first argument is that the scope of *Bintz I* was not so limited. Although Judge Conner's opinion said that "the base flood elevations for Transect 1610 as established in the 2015 Preliminary Map" would be set aside and the matter remanded to FEMA for "further investigation," the opinion also found that FEMA acted arbitrarily, capriciously and not in accordance with law "in developing the base flood elevations for South Bethany in the 2015 Preliminary Map." *Bintz*, 413 F. Supp. at 366, 368. Stated differently, Judge Conner's reasoning and analysis applied to the 2015 Preliminary Map for South Bethany as a whole – not just

Plaintiff's property or the transect in which it sits.  Moreover, the order accompanying Judge

Conner's opinion in *Bintz I*, as well as the final judgment, make no reference to Plaintiff's property

or to Transect 1610.  *See* Order & Judgment, *Bintz v. Fed. Emergency Mgmt. Agency et al.*, C.A.

No. 16-1024-CCC (D. Del. Sept. 4, 2019) (D.I. 82 & 83).  Instead, the order and judgment refer to

"the base flood elevations for South Bethany in the 2015 Preliminary Map."  *Id.*  Reading the

opinion, order and judgment together, this Court understands *Bintz I* to have found that FEMA

acted arbitrarily and capriciously in developing the 2015 Preliminary Map for all of South Bethany.

As such, the resulting mandate in *Bintz I* applied to the 2015 Preliminary Map as a whole.  FEMA

did not violate that mandate when it rescinded the rate map for all of South Bethany.[24]

Plaintiff also claims that FEMA violated the *Bintz I* mandate by failing to evaluate whether

(and how) major storms impact South Bethany in a "vastly different manner" than Bethany Beach.

(D.I. 26 at 13-14).  It is true that that failure was one of the reasons underlying Judge Conner's

finding that FEMA had acted arbitrarily and capriciously in developing the base flood elevations

in the 2015 Preliminary Map.  *See Bintz*, 413 F. Supp. at 365; *see also id.* ("FEMA does not

adequately explain why these storms impacted South Bethany's beach in a vastly different manner

than the political subdivisions immediately to its north or why it conducted no inquiry into such

apparent disparity.").  But *Bintz I* did not require FEMA to provide any explanation on remand.

Nor did the mandate prohibit FEMA from using a non-standard methodology in any future flood

insurance rate mapping for South Bethany.  *See id.* at 366 ("Nothing in this opinion should be

construed as the court stating that no possible basis exists for application of a non-standard erosion

---

[24]     Plaintiff makes passing reference to FEMA allegedly violating the due process rights of all
South Bethany property owners in revoking this map without providing advance notice to
them.  (D.I. 26 at 12-13).  Plaintiff has provided no argument or authority to support his
standing to bring such a claim on behalf of his neighbors.

methodology to South Bethany . . . .").  All the mandate required was that the 2015 Preliminary Map be set aside because the base flood elevations set forth therein were arbitrary, capricious or otherwise not in accordance with law.  FEMA did that.  The 2021 Letter of Map Revision now challenged by Plaintiff in this case is an entirely new map for South Bethany developed by FEMA. Any issues Plaintiff has with this new map are handled in his appeal pursuant to 42 U.S.C. § 4104(g) (*i.e.*, Count I) – not via complaints about the *Bintz I* mandate (Count II).[25]

Thus, the Court recommends that Plaintiff's motion for summary judgment be denied and Defendants' motion for summary judgment be granted as to Count II.

### C.    Plaintiff's Claim of Unreasonable Delay in Violation of the APA (Count III)

Plaintiff also claims that FEMA acted with unreasonable delay in issuing the 2021 Letter of Map Revision after *Bintz I*.  (D.I. 1 ¶¶ 69-72; *see also* D.I. 26 at 34).  Under the APA, courts have the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  "[T]he only agency action that can be compelled under the APA is action legally ***required***."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (emphasis in original); *see also id.* at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.").  "[A] plaintiff must show that the agency has a nondiscretionary duty to act and that it has unreasonably delayed in acting on that duty."  *Saavedra Estrada v. Mayorkas*, 703 F. Supp. 3d 560, 569 (E.D. Pa. 2023).

Here, FEMA had no non-discretionary duty to act in the manner Plaintiff alleges.  As Judge Thynge noted in the prior case, "[t]he statute does not restrict FEMA from exercising its judgment on how to properly develop [Flood Insurance Rate Maps] and [Base Flood Elevations]."  *Bintz v. Fed. Emergency Mgmt. Agency*, No. 16-1024-CCC-MPT, 2017 WL 11693118, at *6 (D. Del. Oct.

---

[25]    In any event, FEMA explained the reasoning for its methodology.  (*See* D.I. 24 at 24-25).

19, 2017). After Judge Conner set aside the flood insurance rate map at issue in *Bintz I*, FEMA reinstated an older 2005 rate map for South Bethany that was previously valid. FEMA had no non-discretionary duty to undertake yet another flood insurance study for South Bethany to create a letter of map revision. Any delay in FEMA doing so was not unreasonable under the APA. And even if FEMA did have a non-discretionary duty to undertake a new study and issue a new letter of map revision, any unreasonable-delay claim under the APA was rendered moot by FEMA issuing the 2021 Letter of Map Revision for South Bethany. *See, e.g.*, *Abulkhair v. President of U.S.*, 494 F. App'x 226, 230 (3d Cir. 2012) (APA unreasonable-delay claim moot because "the only available remedy under the APA would have been ordering [the United States Citizenship and Immigration Services] to take action on [plaintiff's] application" and the agency had already granted plaintiff's application); *Denisova v. Mayorkas*, No. 23-1902-MRH, 2024 WL 2043664, at *3 (W.D. Pa. May 8, 2024) (unreasonable delay for non-adjudication of a visa application moot after consular official's denial of application).

Therefore, the Court recommends that Plaintiff's motion for summary judgment be denied and Defendants' motion for summary judgment be granted as to Count III.

*        *        *

Finally, because the Court recommends that Plaintiff's motion for summary judgment be denied and Defendants' motion for summary judgment be granted, the Court declines to reach the issue of remedies available to Plaintiff under the APA. (*See* D.I. 24 at 29-30).[26]

---

[26] The Court is highly doubtful, however, that Plaintiff would be entitled to anything other than reversal and remand in this case even if his arguments were to prevail. *See* 5 U.S.C. § 706 (scope of review only permitting court to compel agency action unlawfully withheld or unreasonably delayed or to hold unlawful and set aside agency decisions). Indeed, in the previous case, Plaintiff attempted – and failed – to obtain additional remedies beyond those provided by the statute. *See Bintz I*, 413 F. Supp. 3d at 368.

## IV. **CONCLUSION**

For the foregoing reasons, the Court recommends that Plaintiff's motion for summary judgment (D.I. 21) be DENIED and Defendants' motion for summary judgment (D.I. 23) be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1) and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be limited to ten (10) double-spaced pages and filed within fourteen (14) days after being served with a copy of this Report and Recommendation. *See* FED. R. CIV. P. 72(b)(2); *see also* FED. R. CIV. P. 6(d). Any responses to the objections shall be limited to ten (10) double-spaced pages and filed within fourteen days (14) after the objections. Failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which is available on the court's website, https://www.ded.uscourts.gov.

Dated: February 3, 2025

UNITED STATES MAGISTRATE JUDGE