# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARD E. BINTZ<br><br>                      Plaintiff<br>v.<br><br>THE FEDERAL EMERGENCY<br>MANAGEMENT AGENCY, *et al.*,<br><br>                      Defendants. | C.A. No. 22-738-GBW-EGT |

Edward E. Bintz

    *Pro Se Plaintiff*

Claudia L. Pare, U.S. DEPARTMENT OF JUSTICE, Wilmington, DE; Sabrina McBride, U.S. DEPARTMENT OF HOMELAND SECURITY, Washington, DC

    *Counsel for Defendants*

## MEMORANDUM OPINION

January 12, 2026
Wilmington, Delaware

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Presently before the Court are the objections of Mr. Edward E. Bintz ("Plaintiff") (D.I. 43) to the Report and Recommendation ("R&R") of Magistrate Judge Eleanor G. Tennyson ("Judge Tennyson") (D.I. 38), recommending the Court deny Plaintiff's motion for summary judgment (D.I. 21) ("Plaintiff's Motion") and grant the cross-motion for summary judgment of Defendants Federal Emergency Management Agency ("FEMA"), Department of Homeland Security ("DHS"), and Cameron Hamilton (collectively, "Defendants") (D.I. 23) ("Defendants' Motion"). Defendants oppose Plaintiff's objections. (D.I. 44). For the reasons set forth below, Plaintiff's objections (D.I. 43) are OVERRULED and Judge Tennyson's Report and Recommendation (D.I. 38) is ADOPTED. Plaintiff's Motion (D.I. 21) is DENIED and Defendants' Motion (D.I. 23) is GRANTED.

## I. BACKGROUND[1]

### A. FEMA's Flood Insurance Studies

"FEMA is responsible for conducting flood insurance studies and creating flood insurance rate maps that cover real property based on those studies." (D.I. 38 at 1 (citing 42 U.S.C. §§ 4011 & 4101; 44 C.F.R. § 64.3)). "During a flood insurance study, FEMA divides land into subsections and evaluates the flood risk for each subsection separately to determine the risk premium rates." (D.I. 38 at 1-2 (footnote omitted)).

---

[1] Neither party objects to Judge Tennyson's background discussion regarding FEMA's process of conducting flood insurance studies and creating flood insurance rate maps. (*See* D.I. 43; D.I. 44). Having reviewed the background section of Judge Tennyson's R&R for clear error and finding none, the Court adopts this portion of the R&R (R&R § I) and cites to Judge Tennyson's discussion therein for relevant background information.

"Generally, the process by which FEMA conducts a coastal flood insurance study is multistage and takes into account coastal morphology and historical trends, with the ultimate goal being to determine an area's base flood levels." (D.I. 38 at 2 (citing AR 1737)).[2] In conducting a flood insurance study, FEMA first identifies "the particular base topography to be used in the study," and "then identifies stillwater elevation levels[3] . . . ." (D.I. 38 at 2 (citing D.I. 26 at 3; D.I. 24 at 4; AR 2309)). "At that point, FEMA divides the beach at issue into individual transects[4]," and "identifies any primary frontal dune[5] present on each transect." (D.I. 38 at 2 (citing D.I. 26 at 2; D.I. 24 at 4)). "After attempting to identify a primary frontal dune, FEMA then takes into account potential erosion of the dune before calculating each transect's base flood elevation." (D.I. 38 at 2). "In estimating potential erosion, FEMA's standard methodology focuses on the size of the cross-sectional area of the primary frontal dune above the 1% annual-chance stillwater elevation." (D.I. 38 at 2-3 (citing AR 1868)). If the primary frontal dune's "cross-sectional area is less than 540 square feet, [it] will be considered an ineffective barrier to flooding and will" experience a wipeout "in FEMA's erosion calculations – i.e., 'dune removal.'" (D.I. 38 at 3 (citing AR 1871)). "If, however, the cross-sectional area is greater than 540 square feet, the primary

---

[2] Citations to "AR" reference the Administrative Record of this case, found at (D.I. 11; D.I. 12; D.I. 16; D.I. 17).

[3] Stillwater elevation levels ("SWELs") "are water surface elevations that occur from astronomical tides and storm surge but exclude certain wave contributions." (D.I. 38 at 2 (citing D.I. 26 at 2; AR 2028)).

[4] Transects "are cross-sections of the beach that run perpendicular to the shoreline." (D.I. 38 at 2 (citing D.I. 26 at 2; D.I. 24 at 4)).

[5] A primary frontal dune is "a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms." 44 C.F.R. § 59.1.

3

frontal dune will be considered an effective barrier and will experience a retreat instead of complete destruction – i.e., 'dune retreat.'" (D.I. 38 (citing AR 1871)). "FEMA then calculates the total potential elevation of surface water expected during a base flood, accounting for the erosion of the primary frontal dune, certain wave contributions and the relevant stillwater elevation, ultimately arriving at the water level where there is a 1% chance of the surface water reaching in any given year," or base flood elevation. (D.I. 38 at 3 (citing D.I. 26 at 8)).

B. **Plaintiff's Property and Procedural History**

"Plaintiff owns a beachfront property in South Bethany, Delaware, which is located along Ocean Drive and within an area identified as Transect 1610." (D.I. 38 at 3 (citing D.I. 1 ¶ 14)). "In 2015, FEMA issued a Preliminary Flood Insurance Rate Map that had the effect of increasing the base flood elevation of Transect 1610 from 12 feet to 13 feet." (D.I. 38 at 3 (footnote omitted) (citing D.I. 1 ¶ 36)). "Plaintiff challenged the 2015 Preliminary Map in a related case in this District and, on September 4, 2019, Judge Conner[6] issued a decision that 'set aside the base flood elevations for Transect 1610 as established in the 2015 Preliminary Map and remand[ed] the matter to FEMA for further investigation.'" (D.I. 38 at 3-4 (footnote omitted) (quoting *Bintz v. Fed. Emergency Mgmt. Agency*, 413 F. Supp. 3d 349, 368 (D. Del. 2019) ("*Bintz I*"))). "Specifically, Judge Conner found that FEMA acted arbitrarily and capriciously when it applied non-standard erosion methodology without sufficient explanation to arrive at a 13-foot base flood elevation for South Bethany." (D.I. 38 at 4 (citing *Bintz I*, 413 F. Supp. 3d at 366)).

"Following remand in *Bintz I*, on January 3, 2020, FEMA issued a 'Notice to Flood Insurance Rate Map (FIRM) User,' which had the effect of vacating the 2015 Preliminary Flood Insurance Rate Map and reinstating the most recent previously effective map," which in this case

---

6   Judge Christopher C. Conner of the Middle District of Pennsylvania, then Chief Judge, was sitting by designation.

was "the 2005 Flood Insurance Rate Map that set the base flood elevation for South Bethany at 12 feet . . . ." (D.I. 38 at 4 (citing AR 0016; AR 0367-68 & 0404)). "Although FEMA had originally intended to defer any repeat flood insurance study, FEMA decided to resume efforts after learning in April 2020 that property owners in South Bethany experienced large increases to their flood insurance premiums from reinstatement of the 2005 Flood Rate Insurance Rate Map." (D.I. 38 at 4 (footnote omitted) (citing AR 0004, 0364-68, 0382, 1580-81, 2500 & 3793-94)).

"FEMA engaged a private firm, Compass, as its mapping partner to conduct the repeat flood insurance study for South Bethany," again using a non-standard erosion methodology. (D.I. 38 at 4 (citing AR 2270-2346; AR 2299-2346)). "Based on the results of the study, FEMA originally issued one Letter of Map Revision for the riverine side of South Bethany on July 30, 2020 and one for the coastal side of South Bethany on February 4, 2021." (D.I. 38 at 4 (footnote omitted) (citing AR 0421 & 0475)). "In response to concerns about the lack of notice and comment, FEMA rescinded both Letters of Map Revision on February 26, 2021 and provided a new comment period." (D.I. 38 at 4-5 (citing AR 0437-41, 0445-46, 0483-85, 0518-20, 0542-43 & 0567-68)). "On September 27, 2021, FEMA ultimately issued one Letter of Map Revision for all of South Bethany with an effective date of February 14, 2022." (D.I. 38 at 5 (citing AR 0708-17; AR 0718-19)).

"On January 10, 2022, Plaintiff appealed the base flood elevations set forth in the 2021 Letter of Map Revision pursuant to 42 U.S.C. § 4104(b) and 44 C.F.R. § 67.6(b)." (D.I. 38 at 5 (citing AR 0725-40)). "In his administrative appeal, Plaintiff challenged several of FEMA's modeling assumptions underlying the 2021 Letter of Map Revision as scientifically and technically incorrect, and he proposed different flood hazard determinations for the area based on his alternative analyses." (D.I 38 (citing AR 0725-40)). "Plaintiff also submitted material from

5

Sustainable Coastal Solutions, Inc., an engineering firm he retained to review FEMA's coastal analysis." (D.I. 38 at 5 (citing AR 0741-52)). "After reviewing Plaintiff's letter and accompanying submissions, FEMA declined to revise the 2021 Letter of Map Revision and explained the reasoning underlying its modeling and base flood elevation determinations." (D.I. 38 at 5 (citing AR 0873-86)). "Because the effective date was delayed by Plaintiff's appeal, FEMA reissued the 2021 Letter of Map Revision on April 5, 2022, and it became effective the same day." (D.I. 38 at 5 (citing AR 1516-25)). "The 2021 Letter of Map Revision designated Transect 1610 as having a base flood elevation of 12 feet and being in a VE Zone, indicating a heightened risk for flooding." (D.I. 38 at 5 (citing AR 1525; AR 1916)).

"Plaintiff filed this action on June 6, 2022, again seeking a determination under 42 U.S.C. § 4104(g) that FEMA acted arbitrarily and capriciously in issuing the most recent iteration of South Bethany's base flood elevations." (D.I. 38 at 6 (citing D.I. 1 ¶¶ 8-10)). "Plaintiff's Complaint also included claims that Defendants' actions following remand in *Bintz I* violated the federal court's mandate rule and the Administrative Procedure Act ('the APA')." (D.I. 38 at 6 (citing D.I. 1 ¶¶ 63-72)). "In addition to reversal of FEMA's decision and remand back to the agency for further proceedings, Plaintiff seeks, inter alia, to have this Court limit FEMA's conduct on remand and order FEMA to refund South Bethany property owners certain sums of money." (D.I. 38 at 6 (citing D.I. 1 at 22-23)).

The parties have filed cross motions for summary judgment. (D.I. 21; D.I. 23) which have been fully briefed (D.I. 22; D.I. 24; D.I. 25; D.I. 26; D.I. 27; D.I. 28; D.I. 29; D.I. 37). Judge Tennyson issued the R&R (D.I. 38) recommending the Court grant Defendants' Motion (D.I. 23) and deny Plaintiff's Motion (D.I. 21). Plaintiff has objected to the R&R (D.I. 43), and those objections have been fully briefed (D.I. 43; D.I. 44). The Court now turns to the merits.

## II. STANDARD OF REVIEW

In reviewing a Magistrate Judge's Report and Recommendation, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court may "accept, reject, or modify, in whole or in part" the Magistrate Judge's findings or recommendations. *Id.* As to those portions to which no objections have been made, the Court must "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b) Advisory Committee Notes; *see also Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987) (explaining the district court's responsibility "to afford some level of review" when no objections have been made).

## III. LEGAL STANDARD

"Under the APA, [the Court] must set aside an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;' or 'without observance of procedure required by law.'" *Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 669 (3d Cir. 2014) (quoting 5 U.S.C. § 706(2)(A), (C)-(D)). In doing so, the Court "must consider whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' while being careful 'not to substitute [its own] judgment for that of the agency.'" *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (first and second alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A satisfactory explanation must include "a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Such

7

an explanation may be unsatisfactory "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "The reviewing court should not attempt itself to make up for such deficiencies: [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Its "review must also be based on 'the administrative record [that was] already in existence' before the agency, not 'some new record made initially in the reviewing court' or 'post-hoc rationalizations' made after the disputed action." *Christ the King*, 730 F.3d at 305 (alterations in original) (quoting *Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 851 (3d Cir. 1999)).

### IV.    DISCUSSION

Plaintiff brings three claims in the Complaint: An Appeal Pursuant to 42 U.S.C. § 4104(g) (Count I), Violation of the Federal Courts' Mandate Rule (Count II), and Violation of the Administrative Procedure Act (Count III).[7] (D.I. 1 at 18-22). Plaintiff lays out six objections to certain topics discussed in Judge Tennyson's R&R: (1) the return frequencies of Hurricane Sandy and Winter Storm Jonas, (2) the Ocean Drive revetment, (3) the primary frontal dune running along Ocean Drive, (4) FEMA's application of a modified erosion methodology, (5) FEMA's wave runup calculations, and (6) FEMA's alleged violation of the mandate rule. The Court will discuss each in turn.

---

[7]   Plaintiff did not object to the R&R's determination that FEMA did not engage in unreasonable delay in violation of the APA (Count III). (*See* D.I. 43; D.I. 44 at 1 n.1). Having reviewed that portion of the R&R for clear error and finding none, the Court adopts said portion of the R&R (R&R § III(C)). The Court thus denies Plaintiffs' Motion and grants Defendants' Motion as to Count III.

A. **The R&R Correctly Held that FEMA Adequately Explained How it Determined Hurricane Sandy and Winter Storm Jonas were 10-year or Less Storms**

Plaintiff first objects to the R&R's determination that FEMA has adequately explained how it determined that Hurricane Sandy and Winter Storm Jonas were 10-year or less storms. (D.I. 43 at 1-4). According to Plaintiff, the fact that FEMA compared "(a) measured water levels from the Lewes tide [gage] (in a 'sheltered waters' location) during Sandy and Jonas against (b) the SWELs calculated *for South Bethany* (an 'open waters' location) by the Region III Report" is not a "valid way to determine the return frequencies of Hurricane Sandy and Winter Storm Jonas." (D.I. 43 at 1). Plaintiff asserts that this is "an invalid, apples to oranges comparison" and that "the detailed, almost 100-page USACE Hurricane Sandy report," which "compared Lewes tide [gage] water levels during Sandy to the NOAA-calculated storm tide water levels for the Lewes tide [gage]," should be used instead. (D.I. 43 at 1-2).

Defendants, in response, assert that FEMA did adequately explain the reasoning behind adopting the method for determining storm frequencies used in this case. (D.I. 44 at 1). Defendants, citing to the Administrative Record, explain that "FEMA used information produced by the U.S. Army Corps of Engineers ('USACE') as part of the FEMA Region 3 Storm Surge Study ('SSS') (which accounts for wide regional climatology and provides a detailed 2D wave and surge model of 186 production storms) and then compared the storm levels from the Lewes, Delaware tide [gage] (the closest, most comparable tide gauge to South Bethany, which does not have a [gage] of its own) to the calculated frequency data from the Region 3 SSS used in South Bethany." (D.I. 44 at 1-2 (citing AR 875, 1149)). According to Defendants, selecting this method enabled FEMA "to account for a wide regional climatology and large universe of storm data." (*Id.* (citing AR 875, 1149)).

9

Judge Tennyson held that "FEMA explained how that data compared with storm levels at the Lewes tide station to result in both storms being considered 10-year or less storms" and that "FEMA adequately explained how that analysis was more robust than any alternative data or analysis that Plaintiff provided." (D.I. 38 at 11). The Court agrees with Judge Tennyson.

The Court may "not to substitute [its own] judgment for that of the agency." *Christ the King*, 730 F.3d at 305. As Judge Tennyson correctly identified, the responsibility of the reviewing court is to "ensure that the agency examined 'the relevant data' and articulated 'a satisfactory explanation' for its action." (D.I. 38 at 10 (quoting *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 824 F.3d 33, 40 (3d Cir. 2016))). And as Judge Tennyson correctly concluded, FEMA provided such an explanation. (*See* D.I. 38 at 10-11). Although Plaintiff may believe that comparing the water levels from the Lewes tide gage during Sandy and Jonas against the SWELs calculated for South Bethany is "an apples to oranges comparison," (D.I. 43 at 1), FEMA explained that "storm water level return periods vary spatially across the coasts." (AR 875). Therefore, according to FEMA, comparing the water levels from the Lewes tide gage during Sandy and Jonas against the "FIS storm tide elevations at Bethany Beach" will result in a much more accurate frequency analysis. (AR 875). It is clear that Plaintiff disagrees with this methodology. (*See* D.I. 43 at 1-4). It may even be that USACE would disagree with FEMA's methodology. (*See id.* at 2 ("[T]he detailed, almost 100-page USACE Hurricane Sandy report clearly states how it determined that Sandy was a 30-year storm . . . .")). However, as Judge Tennyson determined, and as the Court agrees on a de novo review, FEMA's explanation does not lack a "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 168. Therefore, FEMA's determination that Hurricane Sandy and Winter Storm Jonas were 10-year or less storms was neither arbitrary nor capricious.

### B. The R&R Correctly Held that FEMA's Conclusion that Oceanfront Properties are Revetted was Neither Arbitrary nor Capricious

Plaintiff next objects to the R&R's determination that FEMA properly relied on revetment information supplied by the Delaware Department of Natural Resources and Environmental Control ("DNREC") in developing its modified erosion methodology for South Bethany. (D.I. 43 at 3-4). Plaintiff asserts that meeting minutes and correspondence from the South Bethany Town Council show "that the 1999 revetment was installed at only six properties on Ocean Drive [and] had a different design than FEMA claimed . . . ." (D.I. 43 at 3-4).

Defendants respond by claiming that "[t]he R&R correctly concluded that FEMA did not act arbitrarily or capriciously by relying on information provided by [DNREC] to conclude that [O]ceanfront properties are revetted." (D.I. 44 at 3 (citing D.I. 38 at 12-13)). According to Defendants, FEMA was not acting arbitrarily or capriciously when it relied "on information provided by DNREC rather than the minutes of the South Bethany Town Council," as suggested by Plaintiff. (*Id.*).

The Court, once again, agrees with Defendants. Plaintiff has not provided, nor could the Court identify, any requirement that FEMA rely on information provided by Plaintiff (stemming from a town council meeting) rather than information provided by DNREC. The Court believes no such requirement exists. Here, as Judge Tennyson correctly observed, "FEMA considered Plaintiff's information and determined that, even if variations as to dates and parcel location exist, the oceanfront properties were revetted and that any differences in properties were not shown to 'have an appreciable effect on revetment performance of flood mapping results.'" (D.I. 38 at 12-13 (citing AR 0876)). Although Plaintiff may believe that his data (and accompanying analysis) produce more fidelious results, the Court cannot conclude that FEMA's reliance on the information

11

provided by DNREC, and its finding that Plaintiff's information does not result in "an appreciable effect on revetment performance of flood mapping," (AR 0876), were arbitrary or capricious.

        **C.    The R&R Correctly Held that FEMA's Identification of the Primary Frontal Dune for the 2021 Letter of Map Revision was Neither Arbitrary nor Capricious**

Plaintiff next objects to the R&R's determination that FEMA did not act arbitrarily or capriciously in its identification of the primary frontal dune used in the 2021 Letter of Map Revision. (D.I. 43 at 4-6). According to Plaintiff, the R&R errs by failing "to apply the plain language of FEMA's regulation defining what constitutes a 'primary frontal dune' . . . and instead relies on an invalid FEMA guideline that, even if valid, by its own terms does not apply." (D.I. 43 at 4). Specifically, Plaintiff alleges that the standard upon which FEMA relies, FEMA Standard 619, applies only when a Primary Frontal Dune ("PFD") is going to be changed, not if FEMA was going to create one where none previously existed. (*Id.* at 5). Next, Plaintiff asserts that FEMA changed its position on what type of dune the PFD for South Bethany is, and that the R&R "fails to address this major post-hoc shift in position." (*Id.*). Lastly, Plaintiff claims that the PFD FEMA identified for South Bethany came from "unreliable . . . 40-year-old maps created for non-flood mapping purposes," which Plaintiff believes is impermissible. (*Id.* at 5-6 (citing D.I. 26 at 21-22)).

Defendants respond by claiming that the R&R correctly concluded that "FEMA examined the relevant data and provided a satisfactory explanation for its identification of the Primary Frontal Dune . . . ." (D.I. 44 at 4). Defendants first claim that "FEMA Standard 619 provides that, when revising, the dune feature 'must be as continuous as, or more continuous than, the effective PFD and provide an accurate representation of the regional dune feature." (*Id.* at 5 (citing AR 877)). Defendants next assert that FEMA's "analysis of the PFD remains consistent with what was asserted in the Appeal Resolution Letter," despite not using the words "mound-type" to

describe the PFD for South Bethany. (D.I. 44 at 5 n.7 (citation omitted)). Lastly, Defendants contend that "FEMA pointed to multiple sources spanning multiple decades to show that the original dune peaks were along Ocean Drive . . . ." (*Id.* at 4-5 (citing AR 877; AR 1255-1261; AR 1272; D.I. 43 at 15-16)).

The Court agrees with Defendants. *First*, Plaintiff's hyper-technical reliance on the language of FEMA Standard 619 is misplaced. Although FEMA Standard 619 does state that, "*[w]hen revising the dune feature identified as the Primary Frontal Dune* in an effective FIS, the revised feature must be as continuous as, or more continuous than, the effective PFD*," (FEMA Standard 619), Plaintiff has provided no support for his position that a revision of a dune feature cannot include identifying said dune feature for the first time, (*see* D.I. 43 at 4). In fact, FEMA Standard 619 explicitly applies to situations where "the PFD designation [may] be removed altogether." FEMA Standard 619. The Court believes that, if "revising the dune feature identified as the Primary Frontal Dune" can include removing the PFD designation altogether, adding a PFD designation also qualifies. *Cf. Revision*, Black's Law Dictionary (12th ed. 2024) ("1. A reexamination or careful review for correction or improvement.").

*Next*, the Court agrees with Defendants that, just because the Defendants' opening brief (D.I. 24) does not use the words "mound-type dune," Defendants continue to advocate for the PFD analysis that FEMA has consistently proffered. (*See* D.I. 44 at 5 n.7). Therefore, there is no "major post-hoc shift in position" that Judge Tennyson failed to address. (*See* D.I. 43 at 5).

*Lastly*, the Court holds that FEMA adequately explained how it identified the PFD for South Bethany. Although Plaintiff characterizes the sources FEMA used in identifying the PFD for South Bethany as "unreliable, more than 40 years old maps created for non-flood mapping purposes," (D.I. 43 at 5), that is not the case. As Judge Tennyson correctly identified, in support

13

of its PFD, FEMA relied on "(1) South Bethany Sanitary and Sewer Maps from 1973, (2) Topographic Mapping from Delaware Beaches from 1979 from the State of Delaware, and (3) a description of South Bethany in the 1960s and 1970s contained in a document from the Town [of] South Bethany." (D.I. 38 at 13 (citing AR 0877; AR 1255-61; AR 1272)). Although the data FEMA relied on was older, it can hardly be said that FEMA's reliance on said data was unreasonable. The R&R then noted that FEMA explained how "[l]ater topographic data from 2017 . . . showed that the dune peaks for South Bethany are more seaward and . . . narrower than those present north or south of South Bethany." (D.I. 38 (citing AR 0877)). Considering that "the historical evidence demonstrated [that the] primary frontal dune features [are] narrower and more seaward than neighboring areas," and how FEMA asserts that "it is important to maintain regional dune features and [to] avoid modifying primary frontal dunes," the R&R correctly concluded that FEMA's identification of the primary frontal dune was not arbitrary or capricious. (D.I. 38 at 13-14 (citations omitted)).

Judge Tennyson ultimately concluded that she had "been provided with nothing to support a finding that FEMA's primary frontal dune is incorrect, that Plaintiff's primary frontal dune is more correct, or that FEMA's decision to use its own analysis over Plaintiff's was arbitrary or capricious." (D.I. 38 at 14). This Court agrees. The Court recognizes that Plaintiff thinks FEMA should designate the dune built by the U.S. Army Corp of Engineers in the 2008 nourishment as the PFD. (D.I. 43 at 5; *see also* D.I. 38 at 14 (citing D.I. 26 at 25-26; AR 0730-33)). However, as Judge Tennyson correctly observed, "the standard of review under the APA is a narrow one." (D.I. 38 at 14). "FEMA considered Plaintiff's position in his appeal and concluded that he failed to provide adequate support to change the primary frontal dune as proposed." (D.I. 38 at 14 (citing AR 0880)). Ultimately, the Court concludes that FEMA reviewed the relevant data and provided

14

a satisfactory explanation between the facts found and decision made. "This decision was not arbitrary or capricious." (D.I. 38 at 14).

### D. The R&R Correctly Held that FEMA's Modified Erosion Methodology was Neither Arbitrary nor Capricious

Plaintiff next objects to the R&R's conclusion that FEMA's employment of a modified erosion methodology for South Bethany was not arbitrary or capricious. (D.I. 43 at 6). According to Plaintiff, the R&R "ignores extensive evidence provided by Plaintiff that Transect 1610 incurs the same or less erosion and sand loss . . . than in most areas of Bethany Beach." (D.I. 43 at 6 (citing D.I. 26 at 14; AR 0778-0882)). Additionally, Plaintiff alleges that the R&R fails to recognize that FEMA, in justifying its modified erosion methodology, fails to identify prior studies that create "anywhere near the extreme degree of erosion it created in South Bethany . . . ." (D.I. 43 at 7). Plaintiff also claims that the R&R failed to appreciate the extent to which FEMA's analysis was underpinned by "incorrect or misleading statements," as well as the R&R's failure to address "FEMA's post-hoc claim that the USACE dune should be considered a 'temporary shoreline disturbance' . . . ." (*Id.*).

In response, Defendants claim that "the R&R properly determined that FEMA sufficiently justified its selection of a modified erosion method over a standard erosion method." (D.I. 44 at 6). Specifically, Defendants first claim that "FEMA . . . evaluated the standard erosion method but determined that the results were not consistent with observed historical erosion and historical storm evidence." (*Id.* (citing AR 880-83, 2317-2322, 2329-35)). Defendants further contend that, merely because Plaintiff has supplied evidence "that Transect 1610 incurs the same or less erosion and sand loss than in other areas of Bethany Beach," it is not necessary that FEMA treat his property differently. (*Id.*). Defendants also assert that, despite Plaintiff's claim that "FEMA never identified prior studies where erosion methodologies were applied similarly to South Bethany . . .

15

FEMA has provided examples of other nearby locations in which FEMA used non-standard erosion methodologies." (*Id.* at 7 (citing AR 0883)). Lastly, Defendants contend that the R&R correctly declined to address Plaintiff's argument regarding "FEMA's contention of a man-made dune as a 'temporary shoreline disturbance,'" as Plaintiff has not shown where in his appeal it was addressed. (*Id.*).

The Court once again agrees with Defendants. As the R&R correctly noted, FEMA first evaluated South Bethany using its standard erosion model, "but found that model yielded results that were inconsistent with historical storm erosion." (D.I. 38 at 15 (citing AR 2333; AR 2317-22)). The R&R then found that "FEMA . . . modified the standard erosion methodology for the South Bethany coastal study pursuant to FEMA guidance 'to ensure that erosion treatment was more consistent with demonstrated local and historic erosion conditions.'" (D.I. 38 at 16 (quoting AR 2329-35)). FEMA explained how the modified erosion methodology "allowed the dune retreat to end inland to account for inland volumes of sand" while also preserving "'the slope conditions' of the standard dune retreat geometries that were historically observed." (*Id.* at 16-17 (quoting AR 2334)). Based on the above, Judge Tennyson then held that "FEMA has provided a sufficient explanation and rationale" for applying its modified erosion methodology. This Court agrees with Judge Tennyson.

The Court finds Plaintiff's objections unpersuasive. *First*, FEMA was not acting arbitrarily or capriciously by underpinning its rationale for employing a modified erosion methodology to its decisions regarding the return frequencies of Sandy and Jonas, the revetment it found to run along Ocean Drive, and its asserted PFD. (*See* D.I. 43 at 6). As discussed *supra*, such decisions were not arbitrary or capricious, and neither was FEMA's reliance thereof. *Second*, the R&R did not ignore "extensive evidence . . . that Transect 1610 incurs the same or less erosion and sand loss

[when compared to] most areas of Bethany Beach." (D.I. 43 at 6). To the contrary, the R&R explicitly found that "FEMA considered the 2008 nourishment and other objections raised by Plaintiff, but ultimately determined that recent 'examples of storms that caused erosion, damage, flooding, and sand loss to South Bethany . . .' demonstrated that such storms happen frequently in the area and that the standard erosion method underestimates the coastal hazard." (D.I. 38 at 18 (quoting AR 0880-84)). The R&R then held that such a determination, based on FEMA's stated reasoning, was not arbitrary or capricious. (*Id.*). That Transect 1610 *specifically* did not experience the same extent of damage or flooding as other areas of South Bethany does not mean FEMA was obligated to treat it differently. FEMA provided a rational explanation (as required) for why it applied a modified erosion methodology to Transect 1610, despite Plaintiff's evidence. *Third*, although Plaintiff appears to fault the R&R for failing to recognize that "FEMA never identifies . . . any beach where it applied an erosion methodology that creates anywhere near the extreme degree of erosion it created in South Bethany," (D.I. 43 at 7), the Court cannot identify a requirement where FEMA must do so. *Fourth*, Plaintiff appears to allege that the R&R errs by not appreciating the importance of the "incorrect or misleading statements" underpinning FEMA's analysis that Plaintiff identifies. (D.I. 43 at 7). But the R&R squarely addresses these statements. (D.I. 38 at 17 ("Plaintiff asserts that FEMA makes several incorrect or misleading statements . . . .")). The R&R held that "none of the allegedly 'incorrect or misleading' statements identified by Plaintiff demonstrate that FEMA's use of the modified erosion methodology in this case was arbitrary or capricious." (D.I. 38 at 17 (citation omitted)). This Court agrees. As analyzed above, FEMA has provided sufficient justification for its decision. *Fifth*, although Plaintiff again attempts to fault the R&R for not addressing "FEMA's post-hoc claim that the USACE dune should be considered a 'temporary shoreline disturbance,'" the Court believes that the R&R's treatment of

this argument was proper. As explained above, the Court's "review must also be based on 'the administrative record [that was] already in existence' before the agency, not 'some new record made initially in the reviewing court' or 'post-hoc rationalizations' made after the disputed action." *Christ the King*, 730 F.3d at 305 (alterations in original) (quoting *Rite Aid*, 171 F.3d at 851). Here, both Judge Tennyson and this Court have analyzed the administrative record before FEMA. (*See generally* D.I. 38 (analyzing the administrative record)). The Court's determination that FEMA's modified erosion methodology is not dependent on whether the USACE dune should be considered a "temporary shoreline disturbance," and therefore the Court need not address this allegedly "post-hoc rationalization." FEMA's "rationalization" in the administrative record is sufficient.

### E. FEMA's Wave Setup Counting was not Arbitrary or Capricious

Plaintiff next objects to the R&R's conclusion that FEMA's failure to remove stillwater wave setup was not arbitrary or capricious. (D.I. 43 at 8-9). Plaintiff bases his objections off Judge Tennyson's alleged failure to recognize that FEMA did not follow its own guidance when failing to remove the stillwater wave setup when calculating the base flood elevation. (*Id.* at 8 (The R&R "never discusses what the draft guidance actually says ...."); *see also id.* ("FEMA guidance ... directs that wave setup be removed ...."); *id.* at 9 ("FEMA never discloses that it's applying Runup 2.0 in a way that contradicts its published guidance.")). However, Defendants and Judge Tennyson all acknowledge that FEMA failed to follow its own guidance in failing to remove wave setup. (D.I. 38 at 19 ("Defendants acknowledge the FEMA guidance and that FEMA did not remove wave setup from its model"); *see also* D.I. 44 ("FEMA did not remove wave setup from its model, even though FEMA guidance cited by Plaintiff has instructed mapping partners to subtract wave setup from the SWELs.")).

To the extent that Plaintiff objects to Judge Tennyson's determination that FEMA provided a satisfactory explanation as to why it deviated from its own guidance, the Court finds Plaintiff's

objection unpersuasive. "It is well-established that an agency may not depart from 'established precedent without announcing a principled reason for such a reversal.'" *Fertilizer Inst. v. Browner*, 163 F.3d 774, 778 (3d Cir. 1998) (quoting *Donovan v. Adams Steel Erection, Inc.* 766 F.2d 804, 807 (3d Cir. 1985)). However, in the Court's view, FEMA has articulated such a principal reason. FEMA points to "a North Carolina sensitivity study [that] concluded that any incidental wave setup . . . which included wave runup did not materially impact modeling results." (D.I. 44 at 8). Although Plaintiff believes that FEMA has taken the study beyond its scope by refusing to remove wave setup from the SWELs to which the wave runup is added, (D.I. 26 at 30), FEMA has explained that "the removal of wave setup from the . . . SWEL is not feasible given the complex statistical analysis used in the model . . . ." (D.I. 28 at 6). The Court finds that FEMA's explanation as to why it did not remove wave setup from its SWEL is sufficient and holds that the calculated base flood elevation for South Bethany was not arbitrary or capricious for that reason.

\* \* \*

Thus, for all the preceding reasons, the Court denies Plaintiff's Motion and grants Defendants' Motion as to Count I.

### F. FEMA Did Not Violate the Mandate Rule by Applying a Nonstandard Erosion Methodology to South Bethany

Plaintiff lastly objects to the R&R's conclusion that FEMA did not violate the mandate rule when FEMA applied a nonstandard erosion methodology to South Bethany's beaches. (D.I. 43 at 10). According to Plaintiff, "[t]he 'letter and spirit' of Chief Judge Conner's opinion required FEMA, on remand, to explain how major storms impacted South Bethany in a vastly different manner if it wanted to apply a nonstandard erosion methodology to South Bethany's beach[es]." (*Id.*). However, Judge Conner said nothing of the sort. In Plaintiff's original appeal of the 2015, Judge Conner merely found that "discrepancies in the administrative record combined with

FEMA's myriad unsupported conclusions preclude the court from identifying a rational chain of supported inferences leading to the 2015 Preliminary Map" and was "constrained to conclude that FEMA acted arbitrarily and capriciously and not in accordance with law in developing the base flood elevations for South Bethany in the 2015 Preliminary Map." *Bintz I*, 413 F. Supp. 3d at 366. In fact, Judge Conner explicitly stated that "[n]othing in this opinion should be construed as the court stating that no possible basis exists for application of a non-standard erosion methodology to South Bethany transects resulting in a 13-foot base flood elevation." *Id.* Judge Conner never stated the *only* way for FEMA to apply a non-standard erosion methodology in South Bethany was if it showed a difference in how major storms impacted South Bethany; he only opined that the record before him was insufficient for FEMA to have acted in such a manner. There is now a new record before this Court, and this Court concludes that, in applying a modified erosion methodology to South Bethany in the 2021 Letter of Map Revision, FEMA did not act arbitrarily or capriciously, nor did it violate the mandate rule. Thus, the Court denies Plaintiff's Motion and grants Defendants' Motion as to Count II.

V. **CONCLUSION**

For the reasons stated above, the Court ADOPTS Judge Tennyson's R&R and OVERRULES Plaintiff's objections. Plaintiff's Motion for Summary Judgment (D.I. 21) is DENIED and Defendants' Cross-Motion for Summary Judgment (D.I. 23) is GRANTED. The Court will issue an Order consistent with this Memorandum Opinion.